IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PHILIP MAIER,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL NO. 1:CV-09-1427** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **REVERAND JAMES PALL,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

# M E M O R A N D U M

Plaintiff Philip Maier, an inmate presently confined at the State Correctional

Institution in Dallas, Pennsylvania ("SCI-Dallas"), commenced this civil rights

action on July 23, 2009, with a complaint filed pursuant to the provisions of 42

U.S.C. § 1983, as supplemented on April 1, 2011.[1]  (Doc. 1; Doc. 49.)  Named as

Defendants are various officials from SCI-Dallas and the Pennsylvania Department

of Corrections ("DOC").[2]  In the amended complaint, Plaintiff claims that

---

[1] Plaintiff's pleading, dated April 1, 2011, is docketed as an "amended complaint," but titled by Plaintiff as a "supplemental complaint."  (*See* Doc. 49.)  Pursuant to Federal Rule of Civil Procedure 15(d), the court will deem Document 49 as a supplemental complaint.

[2] Specifically named as Defendants are the following: Reverend James W. Pall, Facility Chaplaincy Coordinator; Norm Demming, Corrections Classification Program Manager; Superintendent Michael D. Klopotoski; Vincent Mooney, Department Superintendent for Facilities; Jerome Walsh, Deputy Superintendent for SCI-Dallas' Centralized Services; Gary Davis, Facility Food Service Manager; Reverend Ulli Klemm, Administrator of Religion and Volunteer Services; Lawrence Mahally, Deputy Superintendent for Facilities Management; David Wakefield, Deputy Secretary of Corrections for the Eastern Region of Pennsylvania; Andrea Priori-Meintel, Director, Bureau of Treatment Services; and James T. Wynder.  (*See* Doc. 111 ¶¶ 2-11.)

Defendants are violating his constitutional rights and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc-2000cc-5, by refusing to give him access to certain religious materials and not granting him an exemption from the DOC's grooming policy on hair and beard length.

Presently before the court is a motion for summary judgment filed on behalf of Defendants. (Doc. 110.) For the reasons that follow, the motion for summary judgment will be granted in favor of Defendants.

## I.   Background

The following facts are related to Plaintiff's claims. The court notes any factual disputes between the parties by presenting both parties' contentions.

At all times relevant, Plaintiff was confined at SCI-Dallas. (*See* Doc. 111 ¶ 1.) The Defendants and their positions at all times relevant are as follows. Defendant Reverend W. James Pall is a former Associate Pastor who is presently employed by the DOC as the Facility Chaplaincy Program Director at SCI-Dallas. (*Id.* ¶ 2.) Defendant Norman Demming is presently employed by the DOC as the Corrections Classification Program Manager and Acting Deputy Superintendent for Centralized Services at SCI-Dallas. (*Id.* ¶ 3.) Defendant Michael D. Klopotoski is presently employed by the DOC as the Deputy Secretary for the Eastern Region. (*Id.* ¶ 4.) Plaintiff adds that at the time he filed his complaint,

Defendant Klopotoski was SCI-Dallas's Superintendent and was a member of the Religious Accommodation Review Committee.  (Doc. 117 ¶ 4.)  Defendant Reverend Ulrich Klemm is presently employed as the Administrator of Religion and Volunteer Services.  (Doc. 111 ¶ 5.)  Defendants Vincent Mooney and Lawrence Mahally both served as Deputy Superintendents for SCI-Dallas's Facilities Management.  (*Id*. ¶¶ 6, 9.)  Plaintiff adds that in 2007 and 2008, Defendant Mahally served as one of two Major-of-the-Guards at SCI-Dallas, and was a member of the RARC when a decision as to Plaintiff's request for religious accommodation was issued in September 2007, prior to Plaintiff's January 22, 2008 request at issue in this case.  (Doc. 117 ¶ 9.)  Defendant Jerome Walsh served as SCI-Dallas's Deputy Superintendent for Centralized Services.  (Doc. 111 ¶ 7.)  Defendant Gary Davis served as SCI-Dallas's Facility Food Manager.  (*Id*. ¶ 8.)  Defendant James T. Wydner has been substituted for former Defendant John Doknovitch, now deceased.  (*Id*. ¶ 10.)  Defendant David Wakefield was employed by the DOC from February 19, 1982 until June 12, 1999, when he retired.  (*Id*. ¶ 11.)  While employed with the DOC, Defendant Wakefield served as SCI-Huntingdon's Superintendent from January 28, 2007 until July 2007, at which time he was appointed Deputy Secretary of the Eastern Region.  (*Id*. ¶¶ 12, 13.)  Defendant Wakefield served in that position until his retirement.  (*Id*. ¶ 13.)  And,

3

lastly, Defendant Andrea Priori Meintel served as the Director of the DOC's Bureau of Treatment Services.  (*Id*. ¶ 14.)

Plaintiff is a practitioner and follower of Odinism, a polytheistic, nature-based faith that worships a variety of gods and goddesses.  (*Id*. ¶¶ 15, 16.)  Plaintiff adds that he is an ordained Apprentice Godhi of the Temple of Wotan.  (Doc. 117 ¶ 15.)  In support of their motion, Defendants assert that the DOC and SCI-Dallas are committed to providing inmates with the opportunity to practice the basic tenets of their faith through religious programs and services, while guarding against the misuse of inmates claiming religious beliefs as a means of obtaining special privileges or breaching security.  (Doc. 111 ¶ 17.)  Plaintiff claims that Defendants have never asserted that he was claiming a religious belief or a request for accommodation as a means of obtaining special privileges.  (Doc. 117 ¶ 17.)  He adds that Defendants have granted "special privileges" to Protestant or Catholic followers by granting their requests for palm fronds in the past.  (*Id*.)

The policies and procedures regarding accommodation of an inmate's religious beliefs are set forth in the DOC's Administrative Directive 819 ("DC-ADM 819"), effective July 19, 2005.  (Doc. 111 ¶ 18; Doc. 112-2, Ex. 2, Attach. A.)  An inmate with any concerns regarding accommodations of a particular faith group is directed to express his concerns to the Religious Accommodation Review

4

Committee ("RARC") by completing an Inmate Religious Accommodation Request Form.  (Doc. 111 ¶ 19.)  Pursuant to DC-ADM 819, an inmate must submit the Form initially to the Facility Chaplaincy Program Director ("FCPD"). (*Id*. ¶ 20.)  The inmate is encouraged to obtain written information from his outside faith group, including any publications that describe the goals, beliefs and practices of the group and supply this information to the RARC for review.  (*Id*. ¶ 21.)  Staff at the particular institution also evaluate the inmate's request for religious accommodation and then forward it to the RARC.  (*Id*. ¶ 22.)  The RARC then reviews the request and makes a recommendation to the Regional Deputy Secretary.[3]  (*Id*. ¶ 23.)  It is the Regional Deputy Secretary who makes the decision to grant or deny a request for a religious accommodation.  (*Id*. ¶ 24.)  After a religious accommodation is either approved or denied, the Facility Manager and the FCPD are notified.  (*Id*. ¶ 25.)  If an inmate is informed that his request will not

---

[3] Plaintiff denies this fact, in part, stating, at the time of his request, the procedure was that once the staff and FCPD make a recommendation, it is forwarded to the Director, Bureau of Inmate Services first, who then convenes a "Central Office Religious Accommodation Review Committee ("CORARC"), purportedly a committee distinct from RARC. (Doc. 117 ¶ 23.)  In support of this disputed fact, Plaintiff cites the Procedures Manual of DC-ADM 819, found in his supporting materials at Exhibit B. (Doc. 118, Ex. B.)  Having reviewed this exhibit, however, the court finds no support for the existence of a CORARC *in addition* to the RARC; rather, the Procedures Manual confirms that the RARC, of whom the Director, Bureau of Inmates Services is Chair, receives the recommendation from staff and the FCPD. (*See id*.)  It appears that RARC and CORARC are the same entity.

be accommodated, he may then file a grievance in accordance with the DOC's Inmate Grievance policy, DC-ADM 804.  (*Id*. ¶ 26.)

The DOC also has an inmate Hygiene and Grooming Policy, DC-ADM 807, effective January 15, 2004.  (*Id*. ¶ 33; Doc. 112-2, Ex. 2, Attach. B.)  DC-ADM 804 provides, in pertinent part, as follows: "Hair that does not fall below the top of the collar (afro styles no longer than four inches) shall be permitted[.]"  (*See* Doc. 111 ¶ 34.)  Section A 2(d) of DC-ADM 807 provides that "an inmate request for a hairstyle exemption based on religion shall be in accordance with DC-ADM 819." (*See id*. ¶ 35.)  Defendants assert that the Grooming Policy is important to institutional security because items of contraband have been found in inmates' hair, including, but not limited to, drugs and small sharp items that could be used as weapons.  (*Id*. ¶ 36.)  In addition, the Grooming Policy is important for purposes of being able to identify inmates.  (*Id*. ¶ 37.)  Plaintiff denies these assertions, claiming they are conclusions of law to be determined by the court, and also noting that in spite of these averments, in the past inmates have received hair and beard length exemptions pursuant to DOC policy.  (Doc. 117 ¶¶ 36, 37.)

On January 22, 2008, Plaintiff submitted a religious accommodation request seeking an exemption from the Grooming Policy with respect to his hair and beard length.  (Doc. 111 ¶ 27.)  In that same request, Plaintiff requested permission to

possess runestones and a Thor's hammer, as well as permission to observe holy days outside. (*Id*.) In support, Plaintiff submitted a nine-page written statement outlining his request, along with two attached exhibits. (*Id*. ¶ 28.) The first exhibit is a letter from John Post, an Allsherjargodhi from the Temple of Wotan. (*Id*. ¶ 29; Doc. 112-2 at 45.) In the letter, Dr. Post states that "it is a common practice amongst the clergy of our faith community to allow their hair to grow long, as well as to encourage the growth of facial hair, *i.e.*, a beard." (Doc. 111 ¶ 30; Doc. 112-2 at 45.) He also states that the "reasons for this may vary from denomination to denomination, but the basic principal applied is that of growing closer to the ancestors and our deities with whom we share common bonds of kinship." (Doc. 112-2 at 45.) The second exhibit is an excerpt from a lecture entitled "Hairy Northern Heathens," given by a man named Strider Rognirhar in 2002. (Doc. 111 ¶ 31; Doc. 112-2 at 46-49.) In it, Mr. Rognirhar, purportedly a member of the Odinist faith, states, "There are no 'commandments' in the Northern Tradition [of Odinism]. No 'thou shalt do' this or 'thou shalt not do' that. In the greater span of things, you are responsible for your own conduct." (Doc. 111 ¶ 32; Doc. 112-2 at 46.) He stated that while he himself was seeking a religious justification for *not* growing his hair under the Odinist faith, he "only found examples of how contemporary devotees of Odin shave their heads due to the skinhead experience

and culture." (Doc. 112-2 at 46.)  However, he also states, "Because hair was a gift

of the Gods, our Ancestors recognized its import and value.  Hair was the seat of

their might and magic." (*Id*. at 47.)

On January 23, 2008, Defendant Deputy Secretary Wakefield informed

Defendant Meintel, the Director, Bureau of Treatment Services, that the RARC

was denying Plaintiff's Religious Accommodation Request, explaining:

> Upon further research by Central Office, including input from pagan
> scholars, regarding the request for hair-length and beard-length
> exemption requests by inmates who associate with pagan religions,
> these requests are denied.  Thor's Hammer is denied because it is a
> symbol used by Security Threat Groups and thus is not permitted in
> the PA DOC.
>
> Runes are denied because they can be used by inmates to manipulate
> others and thus pose a security concern.  Inmate provides insufficient
> detail as to what the holy days noted entail in order for the Religious
> Accommodation Review Committee to make an informed decision.
> Thus observance of holy days is also denied at this time.

(Doc. 111 ¶ 38; Doc. 112-2 at 51.)  On February 23, 2009, Defendant FCPD Pall

sent Plaintiff a memorandum informing him of the decision reached by the Deputy

Secretary and the RARC.  (Doc. 111 ¶ 39; Doc. 112-2 at 55.)

On March 17, 2009, Plaintiff filed Grievance No. 265631, appealing the

denial of his January 2008 request for religious accommodation.  (Doc. 111 ¶ 40;

Doc. 112-2 at 57-58.)  In the grievance, Plaintiff stated, in part, "I've been z-coded

for more than 15 years; so, there is no basis to conclude that performance of the

blotar ritual/ceremony in my cell as prescribed by the elements of my faith group

could have any security concern.  Blotar is a simple ceremony that last[s] at most

20 minutes."  (Doc. 112-2 at 57.)

On March 25, 2009, Defendant Demming responded to Plaintiff's grievance

as follows:

> You reference an ongoing receipt of Odinist Religious literature -
> gungnir.  You haven't been denied the receipt of that literature - so
> that appears to be a non-issue in your grievance.
>
> You include the notion that you have had the runes in your possession
> for years without any security concern.  It certainly is conceivable that
> you would limit your usage of the runes to your own personal
> religious expression, but the DOC can't take the chance that you
> would use them as a tool to gain advantage over weaker inmates.  If
> you were to be successful at convincing a gullible inmate that your
> runes gave you a connection with the divine, then you could coerce
> that inmate to do anything in the name of the gods/goddesses.  The
> fact that you possessed the runes illegally is not a viable argument for
> saying you should be able to continue to possess them.  This argument
> is a legitimate penological rationale despite your objection to the
> contrary.
>
> You contend that you are being denied freedom of speech and
> freedom of religious expression.  No one is ordering you to stop
> talking about Odinism and you are being given freedom of speech in
> expressing your views in the grievance.  Also, you are permitted to be
> an Odinist if you wish, you just can't practice the elements that could
> bring potential harm to other inmates.

(Doc. 111 ¶ 42; Doc. 112-2 at 60.)  On April 13, 2009, Defendant Klopotoski

upheld Defendant Demming's denial of Grievance No. 265631, explaining to

Plaintiff, in pertinent part:

> Mr. Demming, CCPM, was assigned as Grievance Officer and has
> adequately addressed your grievance.  As you have been informed the
> denial decision consisted of seven professional/administrative staff
> who reviewed your request at the institutional level and no less than
> four who reviewed it at the Central Office level.  It is also noted, for
> an accommodation to be granted, the applicant must show that the
> practice he is requesting is a major tenet of their religion's doctrine.
>
> The rationale for denying your possession of your runes that was
> given by the Religious Accommodation Committee is that one inmate
> may use runes to manipulate another inmate.  Again, as Mr. Demming
> noted, you have ample opportunities to interact with other inmates via
> dayroom, meal time, exercise yard, work, etc.
>
> Your allegation that a "kindred" is allowed to exist along with the
> practice of Boltar ritual at SCI Graterford is unfounded.
>
> It is noted you continue to receive Odinist Religious literature, and
> you have not been denied the receipt of this literature.
>
> Your claim that you are being denied freedom of speech and freedom
> of religious expression is founded.  You are permitted to be an
> Odinist, you just cannot practice the elements that could bring
> potential harm to other inmates.  Again, your religious request was
> denied not only by institutional staff, but also at the central office
> level.

(Doc. 111 ¶ 43; Doc. 112-2 at 62.)

Plaintiff appealed this response to the Secretary's Office of Inmate

Grievances and Appeals ("SOIGA").  (Doc. 111 ¶ 44.)  SOIGA reviewed the

original grievance and the Initial Review Response, the appeal to the Facility

Manager and response, and the appeal to final review.  (*Id*. ¶ 45.)  Upon its review

of these materials, SOIGA then issues a final decision.  (*Id*. ¶ 46.)

In this case, SOIGA denied Plaintiff's appeal, explaining:

You have failed to provide any evidence that your rights have been
violated or that your requests for approval for religious items were
improperly denied.  You claimed that you are an Odinist and
requested religious accommodation for hair and beard length
exemption, Thor's hammer, runes and the observance of eight holy
days.  A review of the record reveals that your requests were
submitted and reviewed by the DOC's Central Office Religious
Accommodation Review Committee in accordance with policy.  The
record reveals that no less than 11 professional/administrative staff,
both at the institutional and Central Office levels, reviewed your
accommodation request.  The DOC is not obligated to provide you
with the rationale for its determination.  However, the record reveals
that your hair and beard length exemption was denied as you failed to
provide evidence that such practice is a major tenet of the religion's
doctrine.  According to the article you submitted with your appeal,
"there are no commandments in the Northern Tradition."
Additionally, regarding hair length, the author of the article indicates
that he will make no such law nor will he support one.  Although you
may have had runes in your possession in the past, runes are deemed
to be subject to manipulative use by inmates.  Such manipulation may
involve a superior being or a god rather than another human being as
in the case of board games currently permitted within the institution.
Although you claimed that another "kindred" at another institution is
permitted to practice the Boltar ritual, you have provided no evidence
to support such claims. You failed to provide sufficient details
regarding your request for the observance of eight holy days.  Further
investigation reveals that Thor's hammer is deemed to be a threat to
the security of the institution.  You are not being denied the right of
freedom of speech and freedom of religious expression.  While you
can be an Odinist, you cannot practice the elements that pose potential

11

harm to other inmates and/or threaten the safety and security of the
institution.  Your request for monetary punitive damages is
unwarranted and therefore denied.

(Doc. 111 ¶ 47; Doc. 112-2 at 64.)

Further, Plaintiff claims that, on July 9, 2010, Defendant Mooney searched

Plaintiff while Defendants Mahally and Demming were passing by.  (Doc. 111 ¶

48.)  The search revealed that Plaintiff was in possession of a Thor's hammer,

which Defendant Mooney then directed a Corrections Officer Maholtz to

confiscate.  (*Id*. ¶ 49.)  Plaintiff adds that Defendant Mooney recalled this incident,

as well as the presence of Defendants Mahally and Demming.  (Doc. 117 ¶¶ 48,

49.)  Further, while Plaintiff agrees with Defendants that he did not grieve the

confiscation of his Thor's hammer in July 2010, (*see* Doc. 111 ¶ 50; Doc. 117 ¶

50), he states that he had previously been given permission to possess artifacts

relating to his religion in December 1999, (Doc. 117 ¶ 50).

Finally, Defendants assert that Plaintiff is permitted to practice his religious

beliefs in a manner that does not disrupt the order and security of the prison and

which is consistent with DOC policies.[4]  (Doc. 111 ¶ 51.)  More specifically,

Plaintiff is able to pray or conduct religious rituals in his cell, correspond with and

---

[4] Plaintiff denies this fact, stating that it is a conclusion of law that should be disregarded
by the court.  (Doc. 117 ¶ 51.)

have priests, ministers or religious advisors visit him at the prison, possess

religious books and materials, and other devotional items that are consistent with

prison security policies.  (*Id.* ¶ 52.)


## II.    <u>Standard of Review</u>

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for

granting a motion for summary judgment.  Rule 56(a) provides, "[t]he court shall

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A

factual dispute is "material" if it might affect the outcome of the suit under the

applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis

that would allow a reasonable fact-finder to return a verdict for the non-moving

party.  *Id.*  When evaluating a motion for summary judgment, a court "must view

the facts in the light most favorable to the non-moving party," and draw all

reasonable inferences in favor of the same.  *Hugh v. Butler Cnty. Family YMCA*,

418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

14

## III.  **Discussion**

In their motion for summary judgment, Defendants contend that: (1) Plaintiff has not established the personal involvement of several Defendants; (2) Plaintiff has not established a violation of his First Amendment rights; (3) Plaintiff has not established a violation of RLUIPA; (4) Defendants are entitled to qualified immunity; (5) money damages are not available under RLUIPA; (6) the statute of limitations precludes Plaintiff's claims derived from events which occurred prior to January 2008; and (7) Plaintiff has failed to state a claim for a violation of his right to free speech.  The court will first discuss the merits of Plaintiff's constitutional claims, set forth above as (1) and (7), followed by a discussion of Plaintiff's RLUIPA claim, set forth above as (3).  Further, while Defendants argue that Plaintiff has raised four additional legal claims for the first time in his brief in opposition to the motion for summary judgment, (*see* Doc. 128), construing Plaintiff's complaint and supplemental complaint liberally, (*see* Docs. 1 & 49), the court will address two additional claims: a violation of equal protection and a deprivation of substantive due process.[5]  Because the court finds that Plaintiff has

---

[5] Defendants argue that in his brief in opposition to the instant motion for summary judgment, Plaintiff attempts to raise four new legal claims: deprivation of substantive due process, deprivation of procedural due process, violation of equal protection, and violation of the establishment clause.  It is well-settled that courts need not consider additional claims that are raised for the first time in briefing. *See Aldinger v. Spectrum Control, Inc.*, 207 F. App'x 117, 180 n.1 (3d Cir. 2006) (district court refused to address the plaintiffs' claim that defendants

failed to establish his constitutional claims and his RUILPA claim, the court need

not discuss Defendants' remaining arguments from their motion for summary

judgment.

---

violated the WARN Act by failing to give notice of termination because that issue was raised for the first time in plaintiff's brief in opposition to the defendants' motion for summary judgment and was not pleaded in their complaint); *Treaster v. Conestoga Wood Specialties Corp.*, No. 4:09-cv-632, 2010 WL 2606481, at *3 (M.D. June 25, 2010) (refusing to address additional claims raised by the plaintiff in her brief in opposition to the motion for summary judgment); *Melrose, Inc. v. City of Pittsburgh*, Civ. No. 02-1161, 2008 WL 4449687, at *13 (W.D. Pa. Sept. 30, 2008) ("It is well established that a plaintiff may not attempt to amend a complaint through a brief in opposition to a motion for summary judgment."). Here, after reviewing Plaintiff's complaint and supplemental complaint (Docs. 1 & 49), as well as his brief in opposition to the motion for summary judgment (Doc. 126), while it is clear that Plaintiff has raised claims of violations of his First Amendment rights to free exercise of religion and freedom of speech, as well as a RLUIPA claim, what is less clear are the four additional legal claims Defendants refer to in their reply brief and which are set forth more clearly by Plaintiff in his brief in opposition. While the court does not read the complaint and supplemental complaint to contain a procedural due process claim, out of an abundance of caution, the court will address the other three claims relating to equal protection, the Establishment Clause, and substantive due process. In addition, with respect to these claims, Defendants do argue that there are no facts of record from which the court could reasonably conclude that Plaintiff is entitled to relief. Therefore, in sum, the court will not address a procedural due process claim, as it was raised for the first time in Plaintiff's brief in opposition to the motion for summary judgment, but the court will address claims relating to equal protection, the Establishment Clause, and substantive due process.

## A.   Constitutional Claims

A plaintiff, in order to state a viable § 1983 claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution and laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). A defendant's conduct must have a close causal connection to a plaintiff's injury in order for § 1983 liability to attach. *Martinez v. California*, 444 U.S. 277, 285 (1980).[6] A prerequisite for a viable civil rights claim is that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988). On its face, § 1983 creates no exceptions to the liability it imposes, nor does it speak of immunity for any individual who might deprive another of civil rights. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). Nevertheless, it is well-settled that certain government officials possess immunity from § 1983 liability. *Id.*

---

[6] The Court in *Martinez* explained: "Although a § 1983 claim has been described as 'a species of tort liability,' *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S. Ct. 984, 988, 47 L. Ed. 2d. 128 [(1976)], it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." *Martinez*, 444 U.S. at 285.

### 1.  First Amendment - Free Exercise of Religion

The First Amendment offers protection for a wide variety of expressive activities.  *See* U.S. Const. amend. I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  *See Turner v. Safley*, 482 U.S. 78, 89 (1987).  Although inmates retain certain protections afforded by the First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quotations omitted).

In *Shabazz*, the Supreme Court determined that prison regulations that allegedly infringe upon an inmate's "religious" rights as protected by the First Amendment must be reviewed under a "reasonableness" test that is less restrictive than that ordinarily applied to alleged infringements of constitutional rights.  *Id*. Specifically, that standard for evaluating an inmate's claim that a prison regulation or practice improperly restricts his right to the free exercise of his religion requires a court to evaluate the regulation or practice in order to determine whether "it is reasonably related to legitimate penological interests."  *Id*. at 349.  To establish a free exercise violation, as a threshold, an inmate must show the defendants

18

burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith without any justification reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89.  Further, in determining whether a prison regulation, rule, or practice is "reasonably related" to legitimate penological interests, the following four factor test is applied: (1) whether there is a "valid, rational connection between the prison regulation, rule or practice and the legitimate governmental interest put forward to justify it;" (2) whether there are "alternative means of exercising the right that remains open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) the availability of "obvious, easy alternatives" to the challenged regulation that furthers the governmental interest. *Id.* at 89-91.

The plaintiff bears the burden of persuasion. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.") (citations omitted).  In addition, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id*. (citations omitted).  Great deference must also be

afforded to prison administrators in the adoption and execution of policies and practices that are necessary to preserve internal order and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520, 527 (1979).

In the instant case, Plaintiff claims that Defendants have interfered with his First Amendment right to freely exercise his beliefs by denying his requests for (1) possession of certain religious items, including runestones and a Thor's hammer; (2) an exemption to the DOC's grooming policy; and (3) the outdoor observance of holy days. Defendants argue that Plaintiff has not demonstrated the decisions made regarding his religious accommodations were anything more than the reasonable application of prison policies in order to satisfy legitimate penological interests. The court will discuss each request in turn.

### a.   Possession of Religious Items

On January 22, 2008, Plaintiff submitted a religious accommodation request seeking permission to possess runestones and a Thor's hammer. (*See* Doc. 111 ¶ 27.) The RARC recommended denial of the possession of runestones because they may allow an inmate to gain an advantage over a weaker inmate if that inmate could be convinced that the possessor had a connection with the divine, thereby allowing for coercion and manipulation. (Doc. 112-2, Ex. 2, Attach. D; *see also* Doc. 112-2, Ex. 2, Attachs. H-J.) The denial of runestones on this basis has been

upheld by not only the Third Circuit, but other jurisdictions as well.  *See Dunn v. Sec'y Pa. Dep't of Corr.*, 490 F. App'x 429, 432 (3d Cir. 2012) (holding that the institution's denial of runes was reasonably related to legitimate penological interests); *Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 610-11 (5th Cir. 2008) (finding that runestones and tarot cards could be used for "gambling, trafficking, and trading" and thus "pose a unique security risk").

The RARC also recommended denial of Plaintiff's request for a Thor's hammer, concluding that because it is considered a symbol used by Security Threat Groups, it is a threat to institutional security.  (Doc. 112-2, Ex. 2, Attach. D; *see also* Doc. 112-2, Ex. 2, Attachs. H-J.)  Security concerns are a legitimate penological reason to deny Plaintiff's request for accommodation here.  *See Stoner v. Stogner*, No. 3:06-cv-00324-LRH, 2007 WL 4510202, at *7 (D. Nev. Dec. 17, 2007) (finding the Thor's hammer ban meets the *Turner* standard because there is a "valid, rational connection between banning gang symbols and fighting gang-related activity - if gangs have no access to these symbols, it is one less method of 'challenging' other inmates.").

Here, the court finds that, with respect to the possession of these items in Plaintiff's cell, deference must certainly be afforded to prison personnel in establishing the necessary regulations and procedures to maintain the order,

21

security and discipline within the institution.  Further, regardless of the sincerity of

Plaintiff's beliefs, it is undisputed that Plaintiff is able to pray or conduct religious

rituals in his cell, correspond with and have priests, ministers or religious advisors

visit him at the prison, and possess religious books, materials and other devotional

items that are consistent with prison security policies.  (Doc. 111 ¶ 52.)  Therefore,

Plaintiff has not established that his right to practice religion was burdened in a

substantial or significant way when he was denied the runestones and Thor's

hammer.  Nor has he established that the runestones and Thor's hammer, in

particular, are major tenets of his religious doctrine.  From the record it is clear that

Plaintiff has alternative means of exercising his religious beliefs.  As a result, the

court finds that Defendants are entitled to summary judgment with respect to

Plaintiff's claim regarding possession of certain religious items.

### b.    Exemption to Grooming Policy

In his 2008 religious accommodation request, Plaintiff also sought an

exemption from the DOC's grooming policy with respect to hair and beard length.

(*See* Doc. 111 ¶ 27.)  However, as noted by SOIGA in its review of his related

grievance, Plaintiff's request was denied because he failed to demonstrate that his

practice regarding hair length is a major tenet of his religious doctrine.  (Doc. 111 ¶

47; Doc. 112-2, Ex. 2, Attach. J.)  It was noted that, according to the

documentation submitted by Plaintiff in support of his request, "there are no commandments in the North Tradition [of Odinism]." (Doc. 111 ¶ 47; Doc. 112-2, Ex. 2, Attach. J.)

With respect to the DOC's grooming policy, DC-ADM 807, the Third Circuit Court of Appeals has consistently upheld this regulation with an emphasis on prison security concerns. *See Wilson v. Schillinger*, 761 F.2d 921, 926-28 (3d Cir. 1985) (relying on identical factors to conclude that hair length is not an invalid infringement on First Amendment rights); *Cole v. Flick*, 758 F.2d 124, 130-31 (3d Cir. 1985); *Dreibelbis v. Marks*, 742 F.2d 792, 794-96 (3d Cir. 1984); *see also Dunn v. Secretary Pennsylvania Dep't of Corr.*, 490 F. App'x 429, 431-32 (3d Cir. 2012) (relying on *Turner* factors to conclude that hair length is not an invalid infringement on First Amendment rights). Further, Defendants have submitted numerous declarations of DOC officials setting forth the security concerns which serve as the basis for the issuance of DC-ADM 807. (*See* Doc. 112, Exs. 2-6.) These concerns include the concealment of contraband in inmates' hair and beards, as well as the importance of being able to identify inmates. (Doc. 111 ¶¶ 36-37.)

Based on the foregoing, the court finds that, with respect to the grooming policy, deference must certainly be afforded to prison personnel in establishing the necessary regulations and procedures to maintain the order, security and discipline

within the institution.  Further, regardless of the sincerity of Plaintiff's beliefs, it is

undisputed that Plaintiff is able to pray or conduct religious rituals in his cell,

correspond with and have priests, ministers or religious advisors visit him at the

prison, and possess religious books, materials and other devotional items that are

consistent with prison security policies.  (Doc. 111 ¶ 52.)  Therefore, Plaintiff has

not established that his right to practice religion was burdened in a substantial or

significant way when he was denied an exemption from the DOC's grooming

policy.  From the record it is clear that Plaintiff has alternative means of exercising

his religious beliefs.  And, importantly, Plaintiff has failed to establish that the

practice regarding his hair and beard length is a major tenet of his religious

doctrine.  As a result, the court finds that Defendants are entitled to summary

judgment with respect to Plaintiff's claim regarding exemption from the DOC's

grooming policy.

### c.   <u>Outdoor Observance of Holy Days</u>

In his 2008 religious accommodation request, Plaintiff also requested

outdoor observance of holy days, stating, in relevant part, "I am entitled to bond

with and keep the traditions of my ancestors alive through the practice of . . .

observing festivals, holy days (blots and sumbles)."  (*See* Doc. 111 ¶ 27; Doc. 112-

2 at 36-37, Ex. 2, Attach. C.)  The RARC recommended denial of Plaintiff's

24

request, noting that he failed to provide sufficient detail as to the holy days.  (Doc.

111 ¶ 38; Doc. 112-2, Ex. 2, Attach. D.)  In his brief in opposition, Plaintiff claims

that he was not given notice by the RARC as to the lack of sufficient information

on the observance of holy days, as it was not mentioned in Reverend Pall's letter to

him indicating the RARC's decision, which subsequently triggered his related

grievance.  (Doc. 126 at 20-21.)  However, in its response to Plaintiff's appeal

from the denial of his grievance, SOIGA stated, "You failed to provide sufficient

details regarding your request for the observance of eight holy days."  (Doc. 111 ¶

47; Doc. 112-2, Ex. 2, Attach. J.)  Therefore, the court finds that Plaintiff in fact

was put on notice of his lack of sufficient information as to the holy days in the

grievance process and, thus, had the opportunity to further grieve his request.

Based on the foregoing, the court finds that, with respect to the observance

of holy days, deference must certainly be afforded to prison personnel in

establishing the necessary regulations and procedures to maintain the order,

security and discipline within the institution.  Further, regardless of the sincerity of

Plaintiff's beliefs, it is undisputed that Plaintiff is able to pray or conduct religious

rituals in his cell, correspond with and have priests, ministers or religious advisors

visit him at the prison, and possess religious books, materials and other devotional

items that are consistent with prison security policies.  (Doc. 111 ¶ 52.)  Therefore,

Plaintiff has not established that his right to practice religion was burdened in a substantial or significant way when he was denied outdoor observance of holy days. From the record it is clear that Plaintiff has alternative means of exercising his religious beliefs. As a result, the court finds that Defendants are entitled to summary judgment with respect to Plaintiff's claim regarding outdoor observance of holy days.

## 2.   <u>First Amendment - Free Speech</u>

In connection with the denial of his 2008 religious accommodation request, Plaintiff claims that Defendants have violated his right to free speech under the First Amendment. (*See* Doc. 1 ¶ 33 (". . . the defendants' refusal to grant him a religious accommodation places a substantial burden on his free speech . . . ."); Doc. 49 at 2 (". . . defendants' decision and refusal to permit his request for a religious accommodation to practice the elements of his faith as an Odinist violated Plaintiff's rights under the First Amendment's . . . "free speech" clause.")). It is well-established that prisoners retain the right to freedom of speech under the First Amendment while they are incarcerated. *See Beard v. Banks*, 548 U.S. 521 (2006); *Ramirez v. Pugh*, 379 F.3d 122, 125-26 (3d Cir. 2004). However, a "prison regulation [may] impinge [ ] on an inmate's constitutional rights . . . if it is reasonably related to legitimate penological interests and [is] not an exaggerated

response to those concerns." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

Applying the *Turner* standard here, as set forth *supra*, the court finds that, with respect to Plaintiff's freedom of speech in the context of practicing his religion, deference must certainly be afforded to prison personnel in establishing the necessary regulations and procedures to maintain the order, security and discipline within the institution. Further, regardless of the sincerity of Plaintiff's beliefs, it is undisputed that Plaintiff is able to pray or conduct religious rituals in his cell, correspond with and have priests, ministers or religious advisors visit him at the prison, and possess religious books, materials and other devotional items that are consistent with prison security policies. (Doc. 111 ¶ 52.)  In addition, as stated by Defendant Demming in his response to Plaintiff's Grievance No. 265631, "No one is ordering you to stop talking about Odinism and you are being given freedom of speech in expressing your views in this grievance." (Doc. 112-2 at 60.)  SOIGA also provided, "While you can be an Odinist, you cannot practice the elements that pose potential harm to other inmates and/or threaten the safety and security of the institution." (*Id*. at 64; Doc. 111 ¶ 47.)  Therefore, Plaintiff has not established that his right to free speech was burdened in a substantial or significant way when he was denied the religious accommodation request. From the record it is clear that

Plaintiff has alternative means of exercising his religious beliefs while maintaining

his freedom of speech.  As a result, the court finds that Defendants are entitled to

summary judgment with respect to Plaintiff's claim regarding a violation of his

right to free speech under the First Amendment.

### B. RLUIPA

RLUIPA provides, in pertinent part, that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution . . . (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000c(a)(1).

To prevail on a claim under RLUIPA, an inmate must establish a sincerely

held, authentic religious belief, the exercise of which the government has

substantially burdened.  *Cutter v. Wilkinson*, 544 U.S. 709, 725 (2005).  "Religious

exercise" is defined to include "any exercise of religion, whether or not compelled

by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5.  A plaintiff

has the burden of proving that his religious exercise has been burdened, and that

the burden is substantial.  *Washington v. Klem*, 497 F.3d 272, 277 (3d Cir. 2007).

A "substantial burden" exists where: (1) a follower is forced to choose between

following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive the benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs. *Id*. at 280.

If a plaintiff proves that the government substantially burdened the exercise of a sincerely held religious belief, the burden then shifts to the government, and a court must determine whether the government has demonstrated that the burden was imposed both in furtherance of a compelling government interest and represents the least restrictive means of furthering that compelling government interest. *Id*. at 282. In making this determination, the court is mindful of the fact that "context matters," *Cutter*, 544 U.S. at 723 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)), and gives "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter*, 544 U.S. at 723 (quoting S.Rep.No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900).

In this case, turning first to Plaintiff's requests for runestones, a Thor's hammer, and permission to observe holy days outside, Plaintiff has not demonstrated that the denial of his religious accommodation request has

29

substantially burdened the exercise of a sincerely held religious belief.  While the court will not question the sincerity of Plaintiff's beliefs with respect to these items, it is undisputed that Plaintiff is able to pray or conduct religious rituals in his cell, correspond with and have priests, ministers or religious advisors visit him at the prison, and possess religious books, materials and other devotional items that are consistent with prison security policies.  (Doc. 111 ¶ 52.)  Therefore, Plaintiff has not established that his right to practice Odinism was burdened in a substantial or significant way when he was denied the runestones and Thor's hammer, and was not permitted to observe holy days outside.  Further, his religious accommodation request for these items was denied for compelling security reasons.  As a result, the court finds that Defendants are entitled to summary judgment with respect to Plaintiff's RLUIPA claim regarding possession of religious items.

With respect to the 2008 religious accommodation request from an exemption to the DOC's grooming policy, Defendants found that Plaintiff did not demonstrate a sincerely held religious belief regarding the growing of long hair in connection with Odinism.  Rather, as shown by the documentation submitted by Plaintiff in support of his request, the practice of growing long hair is not a major tenet of Odinism's doctrine, as "there are no commandments in the Northern Tradition [of Odinism]."  (*See* Doc. 111 ¶ 47; Doc. 112-2, Ex. 2, Attach. C.)  Even

if Plaintiff had demonstrated a sincerely held religious belief with respect to his hair and beard length, again there is no evidence that the exercise of his religious beliefs were substantially burdened.  Plaintiff is still free to practice religious beliefs that do not interrupt the order and security of the prison.  As stated by SOIGA in its response to Plaintiff's appeal, "While you can be an Odinist, you cannot practice the elements that pose potential harm to other inmates and/or threaten the safety and security of the institution." (*See* Doc. 111 ¶ 47.)  It is undisputed that Plaintiff is able to pray or conduct religious rituals in his cell, correspond with and have priests, ministers or religious advisors visit him at the prison, and possess religious books, materials and other devotional items that are consistent with prison security policies.  (Doc. 111 ¶ 52.)  As a result, the court finds that Defendants are entitled to summary judgment with respect to Plaintiff's RLUIPA claim regarding an exemption from the DOC's grooming policy.

31

C.   **Equal Protection**

In his supplemental complaint, Plaintiff appears to claim that he was denied his right to equal protection when his 2008 religious accommodation request was denied by Defendants. (Doc. 49 ¶¶ 30-37.)  Although his allegations in support of this claim are confusing, at best,[7] in the interest of justice to this *pro se* plaintiff, the court will nevertheless construe his allegations as those related to an Equal Protection claim.

---

[7] In support of his claim, Plaintiff avers that a corrections officer, purportedly at the direction of Defendant Mooney, confiscated his Thor's hammer in July 2010. (Doc. 49 ¶¶ 30-33.)  Plaintiff states that in the response to Grievance No. 265631, Defendant Demming provided an analogy to justify the taking of the Thor's hammer, namely referencing the possession of palm fronds in Christianity. (*Id.* ¶ 35; *see* Doc. 127 at 13, Ex. J.)  However, from a review of the record, it is clear that Defendant Demming's response to Grievance No. 265631 was filed on March 25, 2009, a date well *before* the July 2010 confiscation of Plaintiff's Thor's hammer. (*See* Doc. 49 ¶¶ 30-33; Doc. 127 at 13, Ex. J.)  Further, Defendant Demming's reference to a practice in Christianity was made in connection with Plaintiff's request for a hair/beard exemption from the grooming policy.  Specifically, Defendant Demming stated,

> In your appeal, you present the writings of Strider Rognirhar from "Hairy Northern Heathens." I have to assume that you have attached them as proof that you are entitled to the hair/beard length exemption.  For an accommodation to be granted, the applicant must show that the practice he is requesting is a major tenet of their religion's doctrine, *i.e.*, an indispensable part.  For example, within Christianity many practitioners receive palm fronds on what we call Palm Sunday. However, if an inmate were denied the possession of a palm frond it wouldn't be inhibiting his right to practice Christianity as it isn't an essential part of the religion.

(Doc. 127 at 13, Ex. J.)  Thus, even if the timing of the grievance response fell within the time of the confiscation of Plaintiff's Thor's hammer, it is clear that Defendant Demming was not making this reference to palm fronds to explain, generally, why Plaintiff's religious accommodation request, which included the request for possession of a Thor's hammer, was denied; rather, he was using this reference to counter the exhibit in Plaintiff's request relating to an Odinist's optional hair length.

The Equal Protection Clause provides that no state shall "deny to any person . . . the equal protection of its laws." U.S. Const. Amend. XIV, § 1.  All persons "similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985); *Artway v. New Jersey*, 81 F.3d 135 (3d Cir. 1996).

To assert a claim for a violation of equal protection, a plaintiff must show that he was treated differently by a state actor from persons who are similarly situated simply because he belongs to a particular protected class, such as a racial or religious group. *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002).  He must also show that this discrimination was purposeful or intentional rather than incidental. *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 423-24 (3d Cir. 2000).

Here, Plaintiff claims that on April 5, 2009, palm fronds were handed out at the prison chapel to Catholic and/or Protestant inmates during services.  (Doc. 49 ¶ 36.)  As a result, Plaintiff argues, "This practice establishes a double-standard on the part of the defendants.  They are willing to encourage, promote, facilitate, adopt, and/or sanction non-essential elements of other faith groups and at the same time deny Plaintiff from even practicing the basic elements of his belief system." (*Id*. ¶ 37.)  Plaintiff's claim, however, is without merit.  DC-ADM 819 establishes

that any inmate with concerns regarding accommodations of any particular faith

group must follow the procedures set forth in that policy, which include

completing a religious accommodation request form. (*See* Doc. 111 ¶ 19.)

Further, from the record it is clear that Plaintiff received the same method of

review and evaluation by prison staff and the RARC. Plaintiff's affliation with a

particular faith group was not the reason for the denial of his requests. Rather, the

denials were based on security concerns with regard to the possession of certain

items and Plaintiff's failure to demonstrate that his practice regarding hair length is

a major tenet of his religious doctrine. Moreover, it is undisputed that Plaintiff is

able to pray or conduct religious rituals in his cell, correspond with and have

priests, ministers or religious advisors visit him at the prison, possess religious

books and materials, and other devotional items that are consistent with prison

security policies. (Doc. 111 ¶ 52.) Accordingly, summary judgment will be

granted in favor of Defendants with respect to Plaintiff's Equal Protection claim.

### D.    **Establishment Clause**

Construing the supplemental complaint liberally, Plaintiff claims that

Defendants violated the First Amendment's Establishment Clause in April 2009

when they handed out palm fronds to Catholic and Protestant inmates in the prison

chapel.[8]  (Doc. 49 ¶ 36.)  The Establishment Clause of the First Amendment

provides that "Congress shall make no law respecting an establishment of

religion." U.S. Const. amend. I.  The Supreme Court has set forth three tests for

determining whether governmental action violates the Establishment Clause: the

coercion test,[9] the *Lemon* test, and the endorsement test.  *Mondrovich v. Allegheny*

*Cnty.*, 385 F.3d 397, 400-01 (3d Cir. 2004).

The *Lemon* test, named after the Supreme Court case of *Lemon v. Kurtzman*,

403 U.S. 602 (1971), is a three-pronged test under which the challenged conduct is

found unconstitutional "if (1) it lacks a secular purpose, (2) its primary effect either

advances or inhibits religion, or (3) it fosters an excessive entanglement of

government with religion." *Mondrovich*, 385 F.3d at 401 (citing *Lemon*, 403 U.S.

---

[8] In his brief in opposition to the motion for summary judgment, Plaintiff also argues that he averred in his complaint that Defendants violated the Establishment Clause by allowing Catholic and Protestant inmates to wear crosses and crucifixes, referring to paragraph 17 of his complaint.  (Doc. 126 at 28.)  However, even a liberal reading of paragraph 17 of Plaintiff's complaint leads the court only to construe his statement as support for his claim that, in denying him a Thor's hammer, prison officials were treating him differently from similarly-situated persons, namely those in a religious group.  Therefore, the court will not include paragraph 17 of his original complaint in this discussion of an Establishment Clause claim.

[9] The coercion test looks at whether the government is "coerc[ing] anyone to support or participate in religion or its exercise . . . ." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). However, this test is not applicable to this case, as it focuses primarily on government action in public education and examines whether school-sponsored religious activity has a coercive effect on students.  *See Modrovich*, 385 F.3d at 400 (citing *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 343 (5th Cir. 1999)).

at 612-13).  Further, in *Young v. Beard*, 284 F. App'x 958, 963 (3d Cir. 2008), the

Third Circuit described the endorsement test as follows:

> More recently, the Court has also applied an "endorsement"
> inquiry for certain Establishment Clause claims.  "The relevant
> question under the endorsement test is 'whether a reasonable observer
> familiar with the history and context of the display would perceive the
> display as a government endorsement of religion.'" *Borden v. Sch.*
> *Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 175 (3d Cir. 2008)
> (quoting *Modrovich*, 385 F.3d at 401).  Thus, when the government
> "affirmatively supports religion on preferential terms," its actions
> violate the Establishment clause under the endorsement test.  *Tenafly*
> *Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 175 (3d Cir. 2002)
> (citation omitted).
>
> We have explained that the "endorsement" test is applicable
> "[i]n cases involving state participation in a religious activity."
> *Borden*, 523 F.3d 247, 258 (3d Cir. 2003).  The Court also emphasizes
> that "[t]he touchstone for [its Establishment Clause] analysis is the
> principle that the 'First Amendment mandates governmental neutrality
> between religion and religion, and between religion and nonreligion.'"
> *McCreary v. County v. ACLY of Ky.*, 545 U.S. 844, 860, 125 S. Ct.
> 2722, 162 L.Ed.2d. 729 (2005) (citations omitted).

*Young*, 284 F. App'x at 963.  The Court in *Young* also recognized that "[t]he

notion of governmental neutrality is an important guide, but it is not a rigid rule."

*Id.* (citing *McCreary*, 545 U.S. at 874).  Importantly, the Court also noted that the

"Supreme Court has long recognized that 'there is room for play in the joints'

between the First Amendment's two clauses concerning religion: 'the government

may . . . accommodate religious practices . . . without violating the Establishment

Clause,' but '[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.''" *Id.* (quoting *Cutter*, 544 U.S. at 713-14).

In this case, the only allegation Plaintiff makes in either his complaint or supplemental complaint that could be construed as an Establishment Clause claim is his reference to the prison handing out palm fronds to Christian inmates on April 5, 2009, and apparently one such day every year. (Doc. 49 ¶ 36; Doc. 126 at 28 ("This practice routinely goes on year to year").) Plaintiff alleges, "[t]his practice establishes a double-standard on the part of the defendants. They are willing to encourage, promote, facilitate, adopt, and/or sanction non-essential elements of other faith groups and at the same time deny Plaintiff from even practicing the basic tenets of his belief system." (*Id.* ¶ 37.) Further, in his appeal from the denial of Grievance No. 265631, Plaintiff requests damages for "blatant bias in permitting non-essential distribution of palm fronds in the chapel and at the same time permitting *complete suppression* of essential elements of my Odinist faith." (Doc. 127 at 16) (emphasis added). While Defendants admit that palm fronds were distributed to inmates who attended chapel services on April 5, 2009, (*see* Doc. 118 at 5), Plaintiff's claim here nevertheless fails under both applicable tests.

Viewing the allegations under the principles established through the *Lemon* test first, it appears that Plaintiff is alleging that, because he is not permitted to

37

practice his religion in the exact way he desires, the distribution of palm fronds to Christian inmates in support of their religion violates the Establishment Clause. However, from Plaintiff's allegations as well as the undisputed facts, it is clear that Plaintiff was permitted to practice Odinism, just not in a way that threatened the security of the institution.  Again, it is undisputed that Plaintiff is able to pray or conduct religious rituals in his cell, correspond with and have priests, ministers or religious advisors visit him at the prison, possess religious books and materials, and other devotional items that are consistent with prison security policies.  (Doc. 111 ¶ 52.)  The fact that Christians are permitted to carry palm fronds on one day of the year, while at the same time Plaintiff is permitted to practice his religion continuously in a manner that does not threaten institutional security, shows that the government is accommodating the religious practices of not only Christians, but also Odinists, both of which are permitted without violating the Establishment Clause. *See Cutter*, 544 U.S. at 713-14.  Moreover, the distribution of palm fronds on one day of the year does not constitute "unlawful fostering." *See Modrovich*, 385 F.3d at 401.  As stated in *Young*, "the Free Exercise Clause requires the government to make reasonable religious accommodations for its prisoners." *Young*, 284 F. App'x at 963 (citing *Hudson v. Palmer*, 468 U.S. 517, 523-24

(1984)).  Here the prison has made such reasonable accommodations to both

Christians and Odinists without impermissibly promoting either religion.

Turning to the "endorsement" inquiry, the court finds that Plaintiff has not

demonstrated that the prison is advancing or endorsing a religious practice by

handing out palm fronds to Christians one day a year, at the same time it permits

Plaintiff to practice Odinism in a manner consistent with security concerns.  The

court does not believe that a "reasonable observer" could interpret this handing out

of palm fronds to Christians as an "endorsement" of religion.

Based on the foregoing, Plaintiff has failed to state a claim under the

Establishment Clause.  Summary judgment will be granted in favor of Defendants

with respect to this claim.

### E.    <u>Substantive Due Process</u>

In his supplemental complaint, Plaintiff claims that Defendants violated his

right to substantive due process when the RARC recommended denial of his

religious accommodation request based on "bias and false information from

[Defendant] Demming."  (Doc. 49 ¶ 39.)  According to Plaintiff, Defendant

Demming provided the RARC with "unsubstantiated claim[s]" that: (1) a Thor's

hammer is a symbol used by Security Threat Groups and thus is not permitted in

the institution, and (2)  runestones can be used by inmates to manipulate others and

thus pose a security concern.  (*Id*. ¶¶ 42, 43.)  He also claims that Defendant

Demming erroneously made reference to Plaintiff's conviction for a racial hate

crime in connection with his recommendation that Plaintiff's religious

accommodation request be denied.  (*Id*. ¶ 40.)  The record, however, indicates that

Defendant Demming's handwritten remark about Plaintiff's conviction was made

on notes related to a 2005 religious accommodation request made by Plaintiff

rather than the request at issue here.  (*See* Doc. 123-1 at 3, Ex. A.)

The constitutional right to "substantive due process" protects individuals

against arbitrary governmental action, regardless of the fairness of the procedures

used to implement them.  *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *see also*

*Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) ("[T]he Due Process Clause

of the Fourteenth Amendment was intended to prevent government from abusing

[its] power, or employing it as an instrument of oppression.") (citations omitted);

*Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is

protection of the individual against arbitrary action of government.").

The Supreme Court has declined to set forth a precise rule that defines the

scope of impermissible "arbitrary" conduct for purposes of applying the

substantive component of the Due Process Clause.  *County of Sacramento v. Lewis*,

523 U.S. 833, 846 (1998) (clarifying that governmental conduct does not violate a

person's substantive due process rights unless it amounts to an abuse of official power that "shocks the conscience"). A substantive due process claim based upon alleged arbitrary and capricious action is not easily mounted, because the relevant level of arbitrariness required in order to find a substantive due process violation involves not merely action that is unreasonable, but rather, something more egregious, which the Third Circuit has termed as "conscience shocking." *Hunterson v. DiSabato*, 308 F.3d 236, 246-47 (3d Cir. 2002). The Third Circuit has made clear that "only the most egregious conduct will be considered arbitrary in the constitutional sense." *Id*. at 247-48.

In this case, nothing in the complaint and/or supplemental complaint rises to the level of conscious shocking behavior that would support a substantive due process claim. Not only does Plaintiff provide no evidence that Defendant Demming's findings with respect to the Thor's hammer and runestones, findings based on previous DOC determinations, were "unsubstantiated," but also there is nothing in the record indicating that the RARC relied on Plaintiff's conviction in order to make the 2008 recommendation denying the religious accommodation.[10]

---

[10] To the contrary, in the record provided by Plaintiff, in response to Plaintiff's second set of interrogatories, Defendants offered that a determination that a Thor's hammer is a symbol used by Security Threat Groups was made by the DOC sometime prior to 2004, and that a determination that runestones could be used by inmates to manipulate others was made by the DOC sometime in 2008. (Doc. 123-5 at 10, Ex. F.) Further, Defendants responded that they made no attempt to verify Mr. Demming's 2005 statement regarding Plaintiff's conviction in

Without such evidence, it cannot be said that the RARC took arbitrary action in recommending denial of Plaintiff's religious accommodation request. Accordingly, Plaintiff has failed to state a claim of a violation of substantive due process, and summary judgment will be entered in favor of Defendants with respect to such a claim.

**IV.   Conclusion**

Based on the foregoing, the motion for summary judgment (Doc. 110) will be granted in favor of Defendants.  An appropriate order follows.

                                     s/Sylvia H. Rambo
                                     United States District Judge

Dated:  May 13, 2014.

---

connection with making a decision as to his 2008 religious accommodation request.  (*Id*. at 11.)